IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
MIDDLE DIVISION

| | |
|---|---|
| JEFFREY WASHBURN, | ) |
| Plaintiff, | ) ) ) |
| v. | ) Case No. 4:18-CV-00647-CLM ) |
| AT&T UMBRELLA BENEFIT PLAN # 1, AT&T UMBRELLA BENEFIT PLAN # 2, AND AT&T UMBRELLA BENEFIT PLAN # 3, | ) ) ) ) ) ) |
| Defendants. | ) |

## MEMORANDUM OPINION

Plaintiff Jeffrey Washburn ("Washburn") brings this action pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001 *et seq.*, challenging Defendants AT&T Umbrella Benefit Plan Nos. 1, 2, and 3's (collectively, "Defendants") denial of his short-term and long-term disability benefits (Count I) and the termination of his life insurance policy while disabled (Count II). *See* Doc. 36, Second Amended Complaint.

Both sides seek judgment in their favor; Defendants have filed a Brief in Support of Motion for Summary Judgment[1] (doc.39) and Washburn has filed a cross

---

[1] The Court's Initial Order orders the parties to file "motions for judgment," rather than "motions for summary judgment," because of the unusual nature of ERISA cases (doc. 5 at 8-9). Yet, Defendants filed a document titled "Brief in Support of Motion for Summary Judgment" (doc. 39). The Court considers this document to be a motion for judgment and supporting brief.

Motion for Judgment (doc. 40). Upon consideration of the motions, briefs, and the record, Defendants' motion (doc. 39) is due to be **GRANTED** and Washburn's cross motion (doc. 40) is due to be **DENIED.**

## BACKGROUND[2]

Washburn began working for Bellsouth Telecommunications, LLC ("Bellsouth") in 2001. Defendants' Statement of Facts ("DSF"), ¶ 1. As a Bellsouth employee, Washburn was a participant in the AT&T Southeast Disability Benefits Program (the "Plan"), which provided short-term and long-term disability benefits to eligible employees. DSF ¶ 4. The Plan is administered by AT&T Services, Inc. and the Claims Administrator for the Plan is Sedgwick Claims Management Services, Inc. ("Sedgwick"), which operated the AT&T Integrated Disability Service Center ("IDSC"). DSF ¶¶ 5, 7.

### A. The Plan

The short-term disability benefits available under the Plan are defined and described in AT&T Umbrella Benefit Plan No. 3 and the Summary Plan Description ("SPD"). Plaintiff's Statement of Facts ("PSF"), ¶ 15. The Plan defined an "Eligible Employee" as a "Bargained Employee on active payroll of a participating company." DSF ¶ 14. An employee could begin to receive short-term disability benefits on the

---

[2] The facts set out in this opinion are gleaned from the parties' submissions of facts claimed to be undisputed, their respective responses to those submissions, and the Court's own examination of the evidentiary record.

eighth consecutive day of absence, if he was an Eligible Employee and considered disabled. DSF ¶ 13. The Plan allowed that if the IDSC determined an employee was eligible for short-term disability benefits, he would receive 13 weeks of benefits at full pay and 39 weeks of benefits at 50% of his total pay, for a total of 52 weeks of short-term disability benefits. DSF ¶ 12. The Plan further specifies that an employee is entitled to receive long-term disability benefits at a rate of 50% of his pay until age 65 if he is an Eligible Employee and continue to remain disabled. DSF ¶ 16. According to the SPD, short-term disability benefits under the Plan end when "[y]our employment is terminated for any reason (including your death, retirement or layoff)." PSF ¶ 16, DSF ¶ 15[3]. The SPD also specified that employees were not eligible for long-term benefits if their employment ends "for any reason … before the expiration of the 52-week maximum for Short-Term Disability Benefits." DSF ¶ 17.[4]

### B. Washburn Approved for Short-Term Disability Benefits

On May 24, 2016, Washburn filed a claim for short-term disability benefits after he suffered a stroke. DSF ¶ 8. Two medical experts appointed by the Social

---

[3] Washburn disputes whether this language was part of "the Plan," based on his argument that the summary plan document is not part of the plan. However, as previously explained, this Court has treated both parties' motions as Motions for Judgment, meaning the Court is the fact finder, based on the briefs and the record. Regardless, it is undisputed among the parties that this language is contained in the SPD.

[4] Washburn also disputes whether this language is contained in the SPD or the Plan. *See* FN 3.

Security Administration confirmed Washburn's disability due to his stroke. PSF ¶ 2. On June 6, 2016, the IDSC gave initial approval of Washburn's short-term disability claim for May 25, 2016 through June 13, 2016. DSF ¶ 18. Washburn's benefits were extended several times and eventually approved through May 22, 2017. DSF ¶ 19, PSF ¶ 4.

### C. Bellsouth Closes Its Birmingham Location

On September 15, 2016, Bellsouth made the announcement that it planned to close its Birmingham center, where Washburn was employed, effective October 1, 2016. DSF ¶ 20. The Birmingham employees were offered the options of following work to Atlanta, Georgia, or seeking another position with the company. DSF ¶ 22. Any employee who did not participate in one of these options would be removed from payroll on December 27, 2016. DSF ¶ 22.

Because he was a member of the Communication Workers of America Union, Washburn had the additional options of either receiving termination pay or entering the Partnership Job Bank. DSF ¶ 22. Entering the Partnership Job Bank allowed Washburn to extend his last date on payroll beyond the Birmingham center's closing date. DSF ¶ 22. Specifically, it allowed Washburn to have his termination pay distributed in bi-weekly payments equal to his weekly wage and remain in the Partnership Job Bank for up to eighteen (18) weeks. DSF ¶ 24.

On November 7, 2017, Washburn informed Bellsouth that he was opting into the Partnership Job Bank. DSF ¶ 25. Washburn remained in the Partnership Job Bank until April 30, 2017, at which point he was removed from Bellsouth's payroll. DSF ¶ 26.

**D. The Termination of Washburn's Disability Benefits**

On January 20, 2017, IDSC notified Washburn that his short-term disability benefits expired on May 22, 2017 and that he might be eligible for long-term disability benefits on that date. DSF ¶ 27. IDSC also informed Washburn that he was required to apply for social security disability income. DSF ¶ 27.

On February 15, 2017, IDSC contacted Washburn to begin the process of applying for long-term disability benefits, because his short-term disability benefits were scheduled to end in May 2017. DSF ¶ 28. On May 4, 2017, IDSC notified Washburn that his request for long-term disability benefits under the Plan were approved effective May 23, 2017. DSF ¶ 30.

When Washburn was removed from Bellsouth's payroll on April 30, 2017, his short-term disability benefits were also terminated. PSF ¶ 5. Washburn's benefits were terminated solely because of the termination of his employment. PSF ¶ 10. IDSC received notification of Washburn's termination on May 16, 2017. DSF ¶ 31. On May 22, 2017, IDSC notified Washburn that he did not qualify for long-term disability benefits because he had not completed the 52-week period of short-

term disability required to receive long-term disability benefits. DSF ¶ 32.

Washburn appealed the termination of his benefits. PSF ¶ 7, DSF ¶ 33. On June 25, 2017, IDSC informed Washburn that his appeal was denied because he no longer met the definition of Eligible Employee, required for benefits, as of his April 30, 2017. DSF ¶ 34.

### E. AT&T's Group Life Insurance Program

As a Bellsouth employee, Washburn also participated in the AT&T's Group Life Insurance Program for Active Employees. DSF ¶ 35. While on short-term disability benefits, an employee is responsible for making employee contributions for continued coverage under the Group Life Insurance Program. DSF ¶ 37. According to plan documents, coverage under the Group Life Insurance Plan ends on the last day of the month that a participant's employment ends. DSF ¶ 36. However, if active employment ends because of a layoff, some coverage under the Group Life Insurance Program may still be available if the former employee continues to pay the premium. DSF ¶ 38. There is an appeal process if an attempt to participate in the Group Life Insurance Program is denied, but the decision must be appealed within 180 days of receipt of the denial notice. DSF ¶ 40. A lawsuit seeking eligibility under the Group Life Insurance Program can only be filed after completing the entire appeals process as defined by the Plan. DSF ¶ 41.

Washburn has not provided any evidence that he attempted to participate in

the Group Life Insurance Program or that he took advantage of the appeals process outlined in the Group Life Insurance Program before filing this lawsuit. Further, any eligibility Washburn had for group life insurance terminated when his short-term disability terminated, unless he either ported his coverage or converted his insurance. Washburn has not provided any evidence that he did either of these things.

## **STANDARD**

The Court's Initial Order in this case makes clear that the final submission of motions and briefs in this case should be motions for final judgment, rather than motions for summary judgment. Doc. 5 at 8-9. In an ERISA case, the general summary judgment standard has limited application because the district court "sits more as an appellate tribunal than as a trial court" and "evaluates the reasonableness of an administrative determination in light of the record compiled before the plan fiduciary." *Curran v. Kemper Nat'l Servs., Inc.*, 2005 WL 894840, *7 (11th Cir. Mar. 16, 2005) (unpublished *per curiam* opinion) (quoting *Leahy v. Raytheon Co.*, 315 F.3d 11, 18 (1st Cir. 2002)).

In light of the district court's role in reviewing ERISA claims, the Eleventh Circuit has provided a six-step sequential framework for reviewing ERISA benefit denials:

1. Apply the *de novo* standard to determine whether the claim administrator's

benefits-denial decision was "wrong" (i.e., the court disagrees with the administrator's decision); if it is not, then end the inquiry and affirm the decision.

2. If the administrator's decision in fact is "*de novo* wrong," then determine whether he was vested with discretion in reviewing claims; if not, end judicial inquiry and reverse the decision.

3. If the administrator's decision is "*de novo* wrong" and he was vested with discretion in reviewing claims, then determine whether "reasonable" grounds supported it (hence, review his decision under the more deferential arbitrary and capricious standard).

4. If no reasonable grounds exist, then end the inquiry and reverse the administrator's decision; if reasonable ground do exist, then determine if he operated under a conflict of interest.

5. If there is no conflict, then end the inquiry and affirm the decision.

6. If there is a conflict, the conflict should merely be a factor for the court to take into account when determining whether an administrator's decision was arbitrary and capricious.

*Blankenship v. Metro. Life. Ins. Co.*, 644 F.3d 1350, 1355 (11th Cir. 2011). The court should conduct its review by considering "the material available to the administrator at the time it made its decision." *Id.* Furthermore, the claimant has the continued burden of proving entitlement to ERISA benefits. *Glazer v. Reliance Std. Life Ins. Co.*, 524 F.3d 1241, 1248 (11th Cir. 2008).

## ANALYSIS

### I. COUNT ONE: Claim for ERISA Benefits

As set forth under the Standard of Review, this Court must follow a six-step framework to determine whether the decision to deny Washburn's disability

insurance benefits was reasonable. The first step of this analysis requires the Court to "review the administrator's decision *de novo* for correctness: based on the evidence before the administrator at the time it made its decision, the court evaluates whether it would have reached the same decision." *Melech v. Life Ins. Co. of N. Am.*, 739 F.3d 663, 674 (11th Cir. 2014). "If the decision is correct, the court goes no further and grants judgment in favor of the administrator." *Id.*

As detailed below, the administrator's decision was correct, so this Court goes no further than step one.

### A. The Administrator's Decision to Terminate Washburn's Short-Term Disability Benefits was Correct.

Under step one, the Court finds that it would have made the same decision as the claims administrator regarding the termination of Washburn's short-term disability benefits.

1. <u>Plain terms of SPD</u>: A review of the administrative record indicates that Sedgwick, the claims administrator, made the decision to terminate Washburn's benefits after he was terminated from employment at Bellsouth due to a surplus. The Plan required that Washburn remain an "Eligible employee" to remain eligible to receive short-term disability benefits. In other words, Washburn had to be "on active payroll of a participating company." When Washburn was removed from payroll due to the surplus, he no longer met the definition of Eligible employee.

Although this is an unfortunate outcome for a long-term employee with a disability, this Court cannot conclude that the administrator's decision was incorrect. The administrator was guided by the specific terms of the SPD, which states that short-term disability benefits under the Plan end when "[y]our employment is terminated for **any reason** (including your death, retirement **or layoff**)." (emphasis added). The parties agree that Washburn was disabled and that he received short-term disability benefits from May 26, 2016 until he was removed from payroll on April 30, 2017. Because the terms of the SPD are clear that short-term disability benefits end when employment is terminated, "for any reason," Sedgwick's decision to terminate Washburn's short-term disability benefits was correct—*i.e.* this Court would have reached the same decision, based on the explicit terms of the Plan. *See Alday v. Container Corp. of Am.*, 906 F.2d 660, 665 (11th Cir. 1990), *cert. denied* 111 S.Ct. 674 (1991) (a right to benefits "can only be found if it is established by contract under the terms of the ERISA-governed plan document.")

2. <u>SPD vs. Plan</u>: Washburn argues that the administrator's decision was incorrect because the termination language is included in the SPD, rather than in the terms of the Plan itself. Although Washburn cites multiple cases to demonstrate that the SPD forfeiture provision is invalid (*see* Doc. 44 at 2), the United States Supreme Court case is not analogous to the case at hand, and the remaining cases Washburn cites are not the law in the Eleventh Circuit. Instead, this Court looks to *Alday v.*

*Container Corp. of America* to determine whether the forfeiture provision contained in the SPD is valid.

In *Alday,* an employer raised the required employee contributions for a retirement health benefit plan and lowered the maximum benefits available under the plan. The plaintiff in *Alday* attacked the validity of the changes and argued that the district court should consider written and oral communications about the plan changes, in addition to the formal plan documents, to find that the employer's changes were invalid. The Eleventh Circuit upheld the district court's decision that other communications, such as a summary of personal benefits booklet or letters to employees nearing retirement, could not modify the terms of the formal plan documents. "ERISA requires that welfare benefit plans be governed by written plan documents which are to be prepared and filed in compliance with ERISA's reporting and disclosure requirements. ***The SPD is the statutorily established means of informing participants of the terms of the plan and its benefits***." *Alday*, 906 F.2d 660, 665 (emphasis added) (citing 29 U.S.C. §§ 1022(a) & 1102; 29 C.F.R. § 2520.102-2). The Eleventh Circuit made clear that the SPD is considered part of the plan documents that govern the terms of benefits, as required by the statute.

Even more importantly, the Eleventh Circuit noted that the right to terminate or modify employee benefits was specifically laid out in the SPD and that this provision was binding, because the SPD was part of the formal plan documents. *Id.*

at 666 ("Here, [] an SPD [] clearly functioned as the plan document required by ERISA. Moreover, the SPD unambiguously set out the rights of the parties, including CCA's right to terminate or modify the plan.")

The same is true here: the SPD is part of the formal plan documents. Because the SPD is a formal part of the plan documents, as required by ERISA, the Court reiterates its former finding that Sedgwick's decision to terminate Washburn's short-term disability benefits was correct, in that it was based on the unambiguous terms of the Plan and the formal plan documents.

### B. Washburn is not entitled to Long-Term Disability Benefits.

Washburn originally filed a Complaint in state court (doc. 1-1) and then filed two Amended Complaints (docs. 25, 36) with this Court. The most recent Amended Complaint is the operative pleading in this case, and in Count I of that Amendment Complaint, Washburn seeks both short-term and long-term disability benefits. *See* Doc. 36 at ¶ 6.

1. Waiver: In his Motion for Judgment, Washburn states that "Counsel for Plaintiff will delay filing a motion for LTD benefits since Defendants have represented that LTD benefit claim will be reevaluated if STD benefits are awarded." Doc. 40 at 1. Defendants argue that Washburn's failure to address long-term benefits in the briefing for "judgment" means that Washburn has waived any claim for long-term disability benefits under Count I. The Court agrees. This conclusion

is supported by both the Court's Initial Order in this case and by case law.

The Court's Initial Order states that "ERISA cases are non jury cases and the court will determine issues of fact." Doc. 5 at 3. The Initial Order further states that, "[i]n the interest of judicial economy and fairness, this case will be set for final submission on briefs and the record." The parties, including Washburn, were informed that the case would be before the Court for ***final submission*** in the Initial Order. Washburn had the opportunity to brief and argue that his long-term disability benefits should not have been denied. Eleventh Circuit case law supports a finding that by failing to brief this issue, Washburn has waived any claim for long-term disability benefits. *See, e.g. Coal. For the Abolition of Marijuana Prohibition v. City of Atlanta*, 219 F.3d 1301, 1326 (11th Cir. 2000) ("failure to brief and argue this issue during the proceedings before the district court is grounds for finding that the issue has been abandoned.") In finding that Washburn waived or abandoned his claim for long-term disability benefits, the Court also notes that Washburn failed to respond to Defendants' argument regarding abandonment, despite the opportunity to do so in his response. *See* Doc. 44.

2. <u>Correctness</u>: Even if Washburn has preserved his claim for long-term disability benefits, the Court would find that the administrator's decision to deny Washburn's long-term disability benefits was correct. The formal plan documents plainly require a participant to exhaust a 52-week period of receiving short-term

disability before becoming eligible for long-term disability benefits. Washburn fell a few weeks short of exhausting the requisite 52 weeks of short-term disability payments; thus the administrator correctly denied long-term benefits.[5]

## II. COUNT TWO: Loss of Insurance Policy

Count II of the operative Complaint in this case (doc. 36) contains a claim for loss of life insurance policy.[6] Specifically, Washburn's complaint seeks reinstatement of his life insurance policy and "appropriate relief." Doc. 36.

But, like his claim for long-term disability benefits, Washburn made no argument in his brief regarding the loss of his life insurance policy (doc. 40), nor did he address this claim in response to Defendants' arguments that (a) Washburn abandoned the claim and (b) it was meritless. *See* Doc. 44. Accordingly, the Court finds that Washburn has abandoned this claim.

## **CONCLUSION**

For the reasons explained above, the Defendants' motion for final judgment (doc. 39) is due to be **GRANTED** and Washburn's motion for final judgment (doc. 40) is due to be **DENIED**. The Court will enter an order consistent with this

---

[5] Defendants dispute Washburn's allegation that Defendants represented they would reevaluate long-term disability benefits if short-term disability benefits were awarded. Doc. 43 at 3. They further point out that Washburn has provided no evidence that such a communication occurred. *Id.* The Court thus applies the plain terms of the formal plan documents.

[6] Washburn's original Complaint (doc. 1-1) did not contain Count II – Loss of Life Insurance Policy.

opinion forthwith.

**DONE** this 12th day of February, 2020.

_____
**COREY L. MAZE**
UNITED STATES DISTRICT JUDGE